# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

———————————————————————  )
C.Y.M. CHI and V.L. CHI, on behalf of      )
themselves and all others similarly situated,  )
                                          )
        Plaintiffs,                       )        CIVIL ACTION
                                          )
v.                                        )        NO: _____
                                          )
VERTRUE, INC., ADAPTIVE MARKETING,  )
LLC, VELO HOLDINGS, INC., MYLIFE.COM,  )
INC., OAK INVESTMENT PARTNERS XII, L.P.,)
and MASTERCARD INTERNATIONAL, INC.,  )        **JURY TRIAL**
                                          )
        Defendants.                       )        **DEMANDED**
———————————————————————  )

## COMPLAINT AND CLASS ACTION COMPLAINT

COME NOW Plaintiffs C.Y.M. Chi and V.L. Chi, by and through their attorneys of record, and file this Complaint and Class Action Complaint on behalf of themselves and all others similarly situated.  This pleading is based upon the current information and belief of Plaintiffs who hereby allege as follows:

## PARTIES

1.

Plaintiffs C.Y.M. Chi and V.L. Chi are husband and wife and residents and citizens of the State of Tennessee.

2.

Defendant Vertrue, Inc. (hereinafter "Vertrue") is a Delaware corporation with its principal place of business in Norwalk, Connecticut. Vertrue is a holding company with subsidiaries that operate "consumer savings clubs."

3.

Defendant Adaptive Marketing, LLC ("Adaptive" or "Adaptive Marketing") is a limited liability company organized under the laws of Delaware with its principal place of business in Norwalk, Connecticut. Adaptive Marketing, a wholly-owned subsidiary of Vertrue, operates a series of "consumer savings clubs" including SavingsAce, SavingSmart, and DealMax.

4.

Defendant Velo Holdings, Inc. ("Velo"), Vertrue's holding company, is a Delaware corporation with its principal place of business in New York, New York.

5.

Defendant MyLife.com, Inc. ("MyLife") is a Delaware corporation with its principal place of business in Los Angeles, California. MyLife operates a social networking web site on which users exchange messages and post profiles containing personalized information.

6.

Oak Investment Partners XII, L.P. ("Oak Investment") is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut.  In 2007, Oak Investment made a $25 million Series A investment in MyLife.

7.

MasterCard International, Inc. ("MasterCard") is a Delaware corporation with its principal place of business in Purchase, New York.  MasterCard operates a payment processing network that, *inter alia*, orchestrates credit and debit card transactions between merchants and consumers.  MasterCard's payment processing network is among the largest in the world, operating in more than 210 countries and territories.

JURISDICTION AND VENUE

8.

This Court has personal jurisdiction over all Defendants because they all transact substantial business within the District.

9.

This Court has original jurisdiction over this matter since it involves claims "arising under . . . the . . . laws . . . of the United States."  See 28 U.S.C. § 1331. The Court also has original jurisdiction over this matter because (i) diversity exists

between named Plaintiffs and Defendants, and (ii) the aggregate claims of the putative Class Members exceed $5,000,000.  <u>See</u> 28 U.S.C. §§ 1332(d)(2)(B), (d)(6).

10.

Venue is appropriate in this District because all Defendants are subject to suit here, have businesses that are national in scope, and do substantial business in the District.

<u>FACTUAL ALLEGATIONS</u>

11.

Through its subsidiary Adaptive Marketing, Vertrue operates numerous "consumer savings clubs" that charge monthly fees, often of more than $20, for purported discounts at various retailers, restaurants, and movie theaters.  These "savings clubs" include, but are not limited to, At Home Rewards, At Home Rewards+, BusinessMax, Cross Country Savings, DealMax, Home Savings Mall, Food and Flix, Getaway and Save, Leisure Exclusives, My Great Deals, Passport to Fun, Passport to Fun+, SavingsAce, SavingSmart, Shopping Essentials, Shopping Essentials+, Simply You, Today's Escapes, Today's Escapes+, ValueMax, and Your Savings Club (collectively "Membership Program(s)" or "Membership Club(s)").

4

12.

Because there is no significant market, demand, or use for these Membership Programs, most of Vertrue's success is directly attributable to its ability to fraudulently and deceptively saddle consumers with unauthorized charges for these programs that consumers do not request, authorize, or, in most instances, even realize they have come into contact with.  Most Vertrue club members sign up for the services by accident, never use the services at all and cancel their memberships immediately upon learning that their credit cards have been fraudulently charged.

13.

Vertrue's scheme to fraudulently and deceptively impose unauthorized charges involves a variety of strategic alliance partnerships with third parties. These partnerships include arrangements with various e-merchants, including Defendant MyLife, to deceive consumers into "joining" Vertrue's "savings clubs." Vertrue, MyLife, and Vertrue's other e-merchant partners ally with numerous banks and payment processing networks such as MasterCard to facilitate the imposition of Vertrue's fraudulent charges.

14.

Vertrue sells its discount "savings club memberships" in partnership with other online businesses such as MyLife (hereafter referred to collectively as "Marketing Partners").   In exchange for a substantial portion of the revenue

generated by Vertrue's Membership Programs, the Marketing Partners not only allow Vertrue to market and sell its programs to their customers, but also provide – unbeknownst to the customer – Vertrue access to customers' private billing information, including their credit or debit card account numbers.

15.

After online consumers "check out," that is, begin the process of purchasing goods and services from Vertrue's Marketing Partners, they encounter stealth offers for Vertrue's "savings club" memberships.  These "post transaction" offers, *inter alia*, take the form of (1) sales offer pages that appear between the checkout page and the confirmation page while the customers are completing their transactions, (2) "pop up" windows with offers which appear on top of the e-merchant's confirmation page, and (3) hyperlinks to enrollment offers that are included on the e-merchant's confirmation page.

16.

Vertrue and its Marketing Partners intentionally create the false and deceptive appearance that these offers for discount Membership Programs are part of the consumers' transactions with the e-merchants.  Any opt-out hyperlinks or other "disclaimers" displayed by Vertrue use text that is the same color as the website background, or a color that is indistinguishably similar, in order to reduce the detectability and/or noticeability of such language.  Frequently, consumers

inadvertently "accept" membership in these "clubs" by clicking onto the next page without realizing what they have done.

17.

Further, the wording of these ads is vague and muddled by design.  Offers are framed as "risk free," no-cost trial memberships or cash back offers.  However, while accepting Vertrue's offers entails recurring monthly fees of $20 or more, this fact is not at all apparent to the unwitting online consumer.

18.

If a consumer "opts", almost invariably by accident, to join a Vertrue savings club, the Marketing Partner relays the consumer's credit card information to Vertrue via a method called "data pass."  The "data pass" practice is particularly shocking because it allows consumers' personal credit card information to be disseminated to other parties without their knowledge or consent.  Because consumers never provide credit card information directly to Vertrue, they reasonably believe that they have not made any additional purchases apart from their original transactions with Marketing Partner such as MyLife.com and cannot imagine that their private credit card information has been relayed to another online business that will be charging them monthly fees, for "savings club memberships" they do not want.

19.

However, Vertrue and its co-conspirators, including MasterCard, use this illicitly obtained financial data to make unauthorized charges on the users' credit and debit card accounts. The process of "authorizing" these transactions is as follows: After Vertrue fraudulently obtains a consumer's credit card data, this information, along with the amount that Vertrue has been "authorized" to charge, is transmitted to the appropriate credit card network, which is frequently the network operated by MasterCard. MasterCard verifies the consumer's identity and, purportedly, analyzes the transaction to determine whether it is fraudulent. Upon determining that a charge is legitimate, MasterCard approves the transaction and transmits the relevant data to the cardholder's issuing bank, which authorizes the charge and sends a verification message to MasterCard. MasterCard passes this information forward, after which the authorization process is completed. MasterCard participates in subsequently "clearing" and "settling" all of Vertrue's charges for that day, at which point Vertrue receives its illicitly obtained funds. MasterCard profits from each fraudulent Vertrue transaction through receipt of transaction processing fees paid by Vertrue and its Marketing Partners.

20.

Thus, Vertrue's entire racketeering enterprise depends upon MasterCard's continued authorization of Vertrue's unauthorized "membership club" charges.

MasterCard could have stopped this scheme long ago had it refused to participate by denying authorization of Vertrue's charges.   Instead, MasterCard chose to process and profit from thousands upon thousands, if not millions, of fraudulent charges that it knew to be illegitimate.   Further, if a user catches onto Vertrue's scheme and manages to wrangle a refund from the company, MasterCard receives a fee for processing the refund.   Thus, MasterCard is an indispensable component of Vertrue's illegal racket, and is positioned to profit whether or not Vertrue manages to hold onto its illicitly gotten funds.

21.

Indeed, Vertrue's co-conspirators all receive compensation for their part in this scheme.   MyLife or another Marketing Partner is paid a "bounty" for every user who signs up with Vertrue during the checkout process.   Whenever Vertrue places a charge on an unknowing consumer's credit or debit card account, MasterCard or another credit card network receives an "assessment fee," and any participating banks receive an "interchange fee."

22.

Further, Vertrue's co-conspirators profit enormously from Vertrue's practices while being well aware that these practices are fundamentally deceptive and illegal.   MyLife hosts Vertrue's misleading ads during its checkout process, meaning that MyLife has full knowledge of, and indeed directly implements,

9

Vertrue's scheme to misrepresent the source and nature of its services. MasterCard, despite publicly trumpeting its supposedly state-of-the-art fraud detection systems, has for years processed and profited from charges from a company that bases its entire business model on fraud. Customers have regularly complained to MasterCard about these charges, yet still find the process of obtaining a refund for these illicit charges to be difficult, confusing and time-consuming.

23.

Despite Vertrue's well-documented use of the data pass method, the company now claims that it requires consumers to enter their credit card information in order to accept one of its "savings club" "offers." However, neither of the Chis, who inadvertently "joined" a Vertrue savings club when signing up for MyLife's supposedly "risk free" trial social networking service, ever provided credit card information directly to Vertrue. Consequently, any claims that Vertrue and its Marketing Partners have wholly stopped using the data pass are incorrect, because, as the Chis' case demonstrates, Vertrue continues to charge consumers who were lured into its fraudulent business model months or years ago, but have not caught on to the scheme and affirmatively canceled their "savings club memberships."

24.

Additionally, even assuming that Vertrue now requires consumers to directly enter credit card information before joining one of its savings clubs, its ads remain profoundly misleading, with vague and muddled wording and key details regarding recurring monthly fees of $20 or more buried in fine print. Consequently, consumers are easily fooled into believing that the Vertrue ads are part of the Marketing Partner checkout process even if the ads require them to enter credit card or other information. This likely confusion is exacerbated by the fact that the receipts for the consumers' actual, intended Marketing Partner purchases do not include any reference to the Vertrue's club membership charges. Emails from Vertrue regarding the Membership Club transaction (if any) are understandably discarded or ignored as spam.

25.

Further, by exploiting the fact that the consumers are completely unaware of their inadvertent enrollment in these Membership Programs, Vertrue uniformly employs a deceptive billing process known as "negative option" where the consumer's credit card is automatically charged a monthly fee unless the consumer takes affirmative steps to cancel the membership. The only indication on the offer page that Vertrue engages in such negative option billing process is in exceedingly fine print that is specifically designed not to attract the consumer's attention.

26.

Affirmative consumer action is impossible until consumers actually become aware that they have been enrolled in the Membership Programs.  Consequently, consumers passively accept Vertrue's monthly charges, believing them to be those of legitimate consumer savings clubs, and pay for unused services for months and even years before realizing the fraudulent nature of these charges.

27.

Vertrue is open about the reality that the vast majority of its club "members" do not know that they are paying for Vertrue's "services."  Vertrue runs a web site (accessible at "http://www.mvq-savingsace.com") the entire purpose of which is to explain to "customers" of "SavingsAce," a Vertrue Membership Club, what the "SavingsAce" charges represent and why these "customers" are paying them.

28.

The web site's frequently asked questions list addresses such issues as, "What is SavingsAce?," "What does MVQ*SAVINGSACE mean, and why is it on my credit or debit card statement?," and "When or how did I enroll in SavingsAce?"  Vertrue explains to its "customers" that they might have joined SavingsAce after "accept[ing] a promotional offer to try one of our cash-back or free shipping offers for a future purchase with one of our marketing partners" or

"[a]fter [they] made a transaction from one of [Vertrue's] online partner's websites." Id.

29.

Clearly, a legitimate company has no need to put up a web site explaining to its existing "customers" what the company's services are, and why the customers are paying for them. Vertrue's "signup" procedures unquestionably induce an enormous number of consumers to "join" Vertrue's Membership Clubs unknowingly, and the only explanation for why Vertrue has persisted in its "marketing" practices despite this well-established fact is that Vertrue fully intended for these inadvertent "signups" to occur.

<strong><u>State Attorney General Investigations</u></strong>

30.

State attorneys general, courts, and even the United States Senate have investigated Vertrue's deceitful sales practices.

31.

In a 2012 settlement with the New York Attorney General, Vertrue agreed to refund $2 million to consumers who it had tricked into signing up for recurring "savings club" charges.

32.

Last year, the Iowa Supreme Court upheld a lower court's ruling that Vertrue's practices violate Iowa's Buying Club Membership Law as well as Iowa's Consumer Fraud Act.   State ex rel. Miller v. Vertrue, Inc., 834 N.W.2d 12, 45 (Iowa 2013).

33.

The Iowa Supreme Court observed that Vertrue's deceptive marketing practices disproportionately harm the elderly.   "[T]the State's calculations demonstrated that persons aged sixty-five or older constituted 50% of all Iowa members that were billed" by Vertrue "ninety or more times without ever using program benefits.  Clearly, the elderly were overrepresented in these statistical populations." Id. at 44.  In discussing a Vertrue program, the Court observed that "figures demonstrated that persons over the age of sixty-five were among the most likely to enroll in the program and among the least likely to use the program benefits . . . [T]he weight of the evidence suggests that these persons never

14

accessed the purported membership benefits because they did not know they were deceived into enrolling." Id. at 44-45.

34.

Indeed, "the record was replete with testimony of Iowans over the age of sixty-five who testified they could not read important disclosures contained in Vertrue's marketing and program materials because their vision, compromised by old age, rendered the fine print illegible." Id. at 45.  In all, Vertrue was assessed $40 million in restitution and fines for fraudulent mistreatment of Iowans.

<strong><u>Senate Investigation</u></strong>

35.

In 2009, Senator John Rockefeller launched an investigation into post transaction marketing targeted at Vertrue as well as Affinion and Webloyalty, two other companies that make use of "post-transaction" schemes that involve the unauthorized transmission of private credit card information and fraudulent billing. This investigation led to a hearing by the Senate's Committee on Commerce, Science, and Transportation.  On November 16, 2009, the Committee released a staff report entitled "Aggressive Sales Tactics on the Internet and Their Impact on American Consumers" which has been attached as Exhibit A hereto.  The Committee issued a "Supplemental Report on Aggressive Sales Tactics on the Internet" on May 19, 2010 which has been attached as Exhibit B hereto.

15

36.

"The November staff report and hearing explained in detail how . . . Vertrue . . . employed aggressive tactics to 'enroll' consumers in membership clubs and charge them monthly fees." See Exh. B, p. i.  The investigation determined that "Vertrue . . . knowingly charged millions of consumers for services the consumers [did] not use and [were] unaware that they [had] purchased." See Exh. A, p. iii. "Most consumers, even very web savvy consumers, [did] not clearly understand the" nature of Vertrue's "membership club offers and [did] not understand that they [could] be enrolled without entering their credit card numbers." Id. at 6.

37.

According to the November staff report, most Vertrue "savings club members" make no use of the clubs' services and have no idea that they are members.  "Internal data and member surveys commissioned by . . . Vertrue . . . clearly show that the . . . compan[y] understand[s] that the majority of [its] paying 'members' have little or no awareness of their financial relationship with the compan[y]." See Exh. A, p. 18.  A Vertrue document displaying "feedback from consumers who had visited one of its membership websites" showed that "[o]f the 'members' who completed the survey, 43% indicated that they were visiting to 'find about the charge on my credit card that I did not recognize' and 44% indicated they were visiting 'to cancel the program.'" Id.  In fact, "[o]nly one

member indicated he or she was there 'to find out more about my membership benefits' and none of the respondents were there 'to obtain my member ID.'" Id. Traffic on Vertrue membership sites was incredibly low relative to the number of Vertrue subscribers, with web traffic "at best. . . represent[ing] only a small percentage (approximately 10-20%) of the total number of Vertrue club 'members.'" Id. at 23.

38.

Vertrue's "'customer service' operations are almost entirely dedicated to handling the large volume of calls from confused and angry customers requesting cancellations, and asking how the company obtained their credit card information." Id. at 17. "Vertrue employees estimated that" Vertrue's call centers "received '7 million customer calls per year' and that 'cancellation calls represent approximately 98% of call volume.'" Id. at 21.

39.

The Senate committee concluded that "Vertrue . . . use[s] aggressive sales tactics intentionally designed to mislead online shoppers . . . [The] compan[y] exploit[s] shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not understand they have purchased." See Exh. A, p. 30.

17

40.

The Senate investigation further concluded that the "data pass" system, though which Vertrue's Marketing Partners transmitted consumers' credit card information to Vertrue, "violated MasterCard and Visa's rules for credit card and debit card transactions." See Exh. B, p. ii.  Nevertheless, banks and credit card networks continued to process, and profit from, Vertrue's bogus membership fee charges.

41.

Harvard Business School Professor Benjamin Edelman supplemented an initial statement to the Senate Commerce Committee with a subsequent work, entitled "Payment Card Network Rules Prohibit Aggressive Post-Transaction Tactics," attached as Exhibit C hereto, in which he notes:

> MasterCard's Rules specifically disallow automatic transfer of customers' card numbers. MasterCard Rules provide that "a Merchant must not sell, purchase, provide, exchange or in any manner disclose Card account number, Transaction, or personal information of or about a Cardholder to anyone other than its Acquirer, to the Corporation, or in response to a valid government demand." Transferring a card number to a post-transaction marketer does not fit any of these narrow exceptions and is therefore prohibited.
> . . .
>
> MasterCard's Rules require each merchant to clearly notify consumers of the name and identity of the company that will charge their cards. MasterCard requires that merchants "*prominently and unequivocally* inform[] the Cardholder of the *identity* of the Merchant . . . so that the Cardholder can *readily distinguish* the Merchant from any other party." In particular, MasterCard requires that the Merchant's site

18

must "prominently display the name of the Merchant . . . *as prominently as any other information* depicted on the Web site." In contrast, post-transaction marketers widely fail to present their names with the requisite prominence.

See Exh. C (emphasis in original).

42.

Vertrue's entire business model is based on violating these credit card merchant rules. Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners repeatedly violated these rules and generated high volumes of customer complaints, triggering fraud warnings and/or fraud monitoring procedures within MasterCard's operations and those of other credit card networks and companies.

43.

Yet, despite abundant evidence that Vertrue's business practices did not meet the MasterCard merchant rules, and despite its knowledge that Vertrue's Membership Club charges are a constant source of complaints, MasterCard and numerous financial institutions continued to process millions of questionable credit and debit charges every month without first verifying the charges with the account holder, as they do with other questionable credit card charges.

44.

In December 2009, Senator Rockefeller sent an open letter to MasterCard and other major credit card companies expressing concern over MasterCard and its peers' role in facilitating Vertrue's unethical business practices. Senator

19

Rockefeller requested information with respect to the safeguards that MasterCard and its peers had in place to ensure that Vertrue and similar companies were not exploiting unwary consumers through their credit card networks.

45.

The previous month, Professor Edelman sent an open letter to MasterCard urging the company to find ways of curbing abuse from predatory "membership club" companies such as Vertrue, observing that "post-transaction marketing" practices brazenly violate MasterCard's customer rules.  According to Professor Edelman, "MasterCard need not sit idly by the wayside while its rules are flouted, to consumers' detriment and to the detriment of the trust and reputation of the MasterCard network."   Although Professor Edelman "look[ed] forward to MasterCard taking action to protect customers from these important problems," MasterCard's participation in Vertrue's fraudulent scheme continues unabated nearly four and a half years after Professor Edelman's letter.

46.

As a result of this Senate investigation, Congress outlawed the "data pass" practice by enacting the Restore Online Shoppers' Confidence Act, 15 U.S.C. 8401, *et seq.*

47.

In 2012, Velo Holdings, Vertrue, and affiliated companies filed for Chapter 11 bankruptcy.  The Chapter 11 filing was remarkable, as it represented an effort by Vertrue and its affiliates to exploit the bankruptcy proceedings as a vehicle to discharge claims for their long historical pattern of fraudulent activity aimed at fleecing consumers, as well as shield this continued notorious activity during the lengthy bankruptcy proceedings.  Even more remarkably, this consumer fraud by Vertrue and its affiliates has continued following the emergence of Vertrue and Velo from bankruptcy in January 2013, as the continued charges to the Chis' credit card well into 2013 demonstrate.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

48.

In April 2011, C.Y.M. Chi saw a message on the MyLife.com web site advertising that a search had "found" an old friend who Mr. Chi wanted to locate. In order to view this individual's profile, Mr. Chi signed up for a one-month free trial with MyLife.  To qualify for this free trial, Mr. Chi was required to provide MyLife with credit card information.   He provided his MasterCard credit card details for his joint credit card account shared with his wife V.L. Chi.  Mr. Chi never provided his credit card information to any entity aside from MyLife during this process.

49.

After Mr. Chi signed up with MyLife, charges for "SavingsAce" began appearing on Mr. and Ms. Chi's credit card statements.  The "SavingsAce" billing name confused the Chis, who assumed that these charges were from Costco or some other consumer savings club to which Ms. Chi belongs.  In reality, however, SavingsAce is a "discount club" operated by Vertrue.

50.

SavingsAce charged the Chis monthly membership fees from April 2011 to August 2013.  These fees rose over time, starting at $19.95 per month and increasing to $27.95 by August 2013.  In all, Vertrue, through SavingsAce, charged the Chis a total of $666.55 over this period.

51.

Eventually, the Chis recognized that the "SavingsAce" charges were not tied to any legitimate services and engaged in lengthy customer complaint processes with MasterCard and Vertrue to cancel the unused and unwanted savings club membership.  While the Chis were able to obtain a partial refund of her losses, they lost the time value of these funds, including interest carried on these fraudulent charges that has never been refunded, have had to engage legal counsel to understand and attempt to remedy these anti-consumer practices, and have expended many hours of time, and experienced considerable frustration and

anxiety, in an effort to correct the consumer abuse and corporate fraud perpetrated upon them.

52.

In addition, during the course of trying to obtain refunds from MyLife, the Chis have learned that aside from the monthly "SavingsAce" charges, MyLife has continued to charge the Chis an annual membership fee in excess of $100, despite that fact that the Chis have had no use for MyLife's services.  MyLife still retains several hundred dollars in unauthorized fees that it illegitimately charged the Chis. This multiplicity of charges, from "savings clubs" and services the Chis do not use, illustrates the confusion caused by Vertrue and its Membership Clubs.

53.

Also, notably, after the Chis contacted MasterCard and MyLife to ensure that the deceptive credit card charges stopped, Mr. Chi at once began to receive frequent, if not daily, emails from MyLife asking him to re-enroll in the MyLife service.   This flurry of solicitations came after Mr. Chi had heard extremely infrequently from MyLife during the period he and his wife's credit card was fraudulently charged.  Thus, it appears that as part of this scheme, Vertrue's Marketing Partners intentionally and automatically go silent and incommunicative with the customer once the hidden credit charges commence in order to lull the

consumer into unawareness.  When the ill-gotten monthly charges cease, however, Marketing Partners spring back into email-solicitation mode.

54.

The Bankruptcy Court approved a reorganization plan applicable to Vertrue and Adaptive Marketing in January 2013 and the plan (the "Plan") became effective on February 4, 2013.  Vertrue, however, posted numerous fraudulent charges against the Chis' credit card account after the Plan became effective, assessing an unauthorized "SavingsAce" charge for $23.95 on February 6, 2013 and continuing to assess monthly charges through September 2013.  Consequently, the Chis do not assert claims against Vertrue for any charges predating February 6, 2013 and base their claims on the fraudulent charges assessed by Vertrue after that date.   (Plaintiffs, however, reserve all rights to file any claims and permitted motions in the United States Bankruptcy Court for the Southern District of New York relating to the pre-confirmation-of-Plan period, including any motion relating to deficient notice of those proceedings to Vertrue victims such as the Chis).

CLASS ALLEGATIONS

55.

Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a class preliminarily defined as follows:

24

**Plaintiff Class**
All persons in the United States who, while completing online sales transactions with a Vertrue Marketing Partner, inadvertently incurred charges for one or more of Vertrue's Membership Programs.

Plaintiffs reserve the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

56.

**Numerosity** – The members of the Class described above are so numerous that joinder of all members by name in one action is impracticable.  Vertrue is a multimillion-dollar company that has post-transaction marketing arrangements with numerous online retailers as well as suspect social networking sites such as MyLife.com.  Consequently, Vertrue's practices have harmed at minimum many thousands of consumers across the country.  All injuries sustained by any member of the Class arise out of the conduct of Defendants as described herein.

57.

**Commonality and Predominance** – Important questions of law and fact exist which are common to all members of the Class and predominate over any questions that may affect individual Class Members.  All Plaintiff Class Members were the targets of, and were victimized by, the same fraudulent and deceptive practices on the part of Defendants, and there are no significant individual issues that would become the focus of the action.  Furthermore, common questions of law and fact include, but are not limited to, the following:

25

a.  Whether Vertrue's monthly membership charges to Plaintiffs' and Class Members' credit and debit card accounts without their authorization constitute wire fraud within the meaning of 18 U.S.C. § 1343;

b.  Whether Vertrue's monthly membership charges to Plaintiffs' and Class Members' credit and debit card accounts without their authorization constitute mail fraud within the meaning of 18 U.S.C. § 1341;

c.  Whether Vertrue's monthly membership charges to Plaintiffs' and Class Members' credit and debit card accounts without their authorization constitute bank fraud within the meaning of 18 U.S.C. § 1344(2);

d.  Whether Vertrue's practice of enrolling consumers in the Membership Programs and Defendants' charging of monthly fees without proper authorization constitute a pattern of racketeering activity;

e.  Whether an association-in-fact enterprise exists among Vertrue, Adaptive, Velo, MyLife, Oak Investment, MasterCard, other potential Defendants, and numerous unnamed Marketing Partners, credit card networks, and credit card companies within the meaning of 18 U.S.C. § 1961(5);

26

f.  Whether Vertrue, Adaptive, Velo, MyLife, Oak Investment, MasterCard, other potential Defendants, and numerous unnamed Marketing Partners, credit card networks, and credit card companies conduct lawful business activity unrelated to the illegal wire, mail, and bank fraud that constitutes the pattern of racketeering;

g.  Whether Plaintiffs' and Class Members' credit, debit, and/or charge information was wrongfully accessed or caused to be accessed by a party who was not authorized to access Plaintiffs' and Class Members' private credit, debit, or charge card information;

h.  Whether the transmission of Plaintiffs' and Class Members' private credit or debit card information between Vertrue and its Marketing Partners over the Internet was in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.;

i.  Whether MasterCard and numerous unnamed credit card networks and credit card companies aided and abetted the fraudulent scheme;

j.  Whether treble damages should be awarded to Plaintiffs and Class Members; and

k.  Whether Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

58.

**Typicality –** The claims of the representatives are typical of the claims of the members of the Class because, among other things, all Plaintiff Class Members were comparably injured through the uniform misconduct alleged herein, and were subject to Defendants' scheme to enroll consumers in the Membership Programs and to cause them to incur unauthorized charges on their credit card and/or debit card accounts.

59.

**Adequacy of Representation –** Plaintiffs will fully and adequately represent and protect the interests of the entire Class because of the common injuries and interests of the Class Members and the uniform conduct of Defendants as to all Class Members.    Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.    Plaintiffs have no interests that are contrary to or in conflict with those of the Classes they seek to represent.

60.

**Superiority –** A class action is superior to all other available methods for fair and efficient adjudication of this controversy.    There is no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.    The damages or other financial detriment suffered by Plaintiffs

and other members of the Plaintiff Class are relatively small compared to the burden and expense that would be required to individually litigate their claim against Defendants, so it would be impracticable for Plaintiff Class Members to individually seek redress for Defendants' wrongful conduct.  Even if the Plaintiff Class Members could afford individual litigation, the prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendants under the laws alleged herein.

## COUNT I
(Violations of Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §
1962(c) – Against All Defendants)

### The RICO Enterprise

61.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

62.

Defendants' conduct resulted in the formation of an association-in-fact RICO enterprise consisting of Vertrue, Adaptive, Velo, MyLife, Oak Investment, MasterCard, and other potential Defendants, along with additional unnamed Marketing Partners and credit card networks.  This association-in-fact enterprise

was formed for the common purpose of making enormous illicit profits by fraudulently marketing and selling the Membership Programs to consumers, including Plaintiffs and the Class Members, and charging recurring monthly fees without proper consent of the consumers. All Defendants not in privity with a Class Member aided and abetted those Defendants that are in privity with a given Class Member.

63.

Each member of the RICO Enterprise can be viewed as a leg of a stool, and without one leg, the stool would topple. Vertrue, through its subsidiary Adaptive Marketing, offers the Membership Programs, and conceived the scam and how to implement it. To do so, Vertrue requires the participation of e-merchants such as MyLife, credit card networks such as MasterCard's, and numerous other unnamed potential Defendants.

64.

Pursuant to the RICO enterprise, Vertrue, MyLife, MasterCard, and their various parents and affiliates, including Velo and Oak Investment, each receive enormous profits from their implementation of the fraudulent scheme. Vertrue's partner credit card companies do not report on each other's involvement in the fraudulent scheme, in violation of the credit card companies' merchant rules.

65.

Vertrue and MyLife are contractually associated through a partnership agreement, under which Vertrue was granted full access to MyLife's checkout process in order to initiate the scam.  Vertrue was also given access to consumers' credit or debit card information that remained on file with the MyLife.  In any instances where Vertrue obtained credit card information from consumers directly, Vertrue nevertheless fraudulently used MyLife's checkout process to camouflage the true nature of its "offers."  MyLife, in turn, was given a substantial portion of the revenue generated by Vertrue fraudulently charging consumers monthly membership fees without their proper consent.  MyLife, further, depended entirely upon the cooperation of MasterCard and other credit card networks and companies to extract the monthly credit card payments.  Velo, as Vertrue's owner, is liable as an active and enabling participant and through the principle of respondeat superior.  Velo's corporate and limited liability protections do not shield it from responsibility for Vertrue and Adaptive's actions since Velo was fully aware of and assisted and profited from Vertrue's scheme.  Oak Investment, similarly, is liable as an active and enabling participant and through the theory of respondeat superior for MyLife's unauthorized relaying of consumer credit card data to Vertrue without the consumers' knowledge and consent.  As a major MyLife investor, Oak Investment was fully aware of and profited from MyLife's role in

this scheme.  Its limited partnership status does not shield it from vicarious liability for MyLife's actions.  As such, the scheme is controlled, managed, and directed by all Defendants and unnamed co-conspirators.

66.

At all relevant times hereto, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).  Each Defendant is legally distinct from the RICO Enterprise.

67.

Each Defendant has a legal existence separate from its participation in the RICO Enterprise's racketeering activity.  In addition to their illegal acts of racketeering, Vertrue and Adaptive conducted the legitimate business of selling Membership Programs through lawful means.  Velo, as their holding company, maintained a legitimate operation to the extent that Vertrue lawfully conducted its Membership Programs.  MyLife is also engaged in lawful business activity by selling subscriptions to its social networking service.  Oak Investment has invested multiple millions of dollars in legitimate businesses.  Likewise, MasterCard legally facilitates millions of legitimate credit card transactions every year.

68.

The RICO Enterprise has been of a long-running, continuous nature and will continue to operate into the future unless the relief sought herein is granted.

69.

At all relevant times, the RICO Enterprise was engaged in, and the racketeering activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

**Racketeering Activity**

70.

Defendants, and each of them, engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in predicate acts that constitute violations of the following statutes: (1) 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1344 (bank fraud).

71.

Each Defendant willfully engaged in a scheme to defraud Plaintiffs and Class Members by:

a. Intentionally concealing that Plaintiffs and Class Members have been enrolled in Vertrue Membership Programs, even though they knew that Plaintiffs and Class Members were unaware of the alleged enrollment;

b. Entering into a partnership agreement, and intentionally concealing this contractual arrangement, under which Vertrue unlawfully gained access to the consumers' credit card information from MyLife and its other Marketing Partners without first obtaining proper authorization from consumers;

33

c. Intentionally concealing that Vertrue automatically charges consumers' credit cards on a monthly basis without first obtaining their proper authorization; and

d. Intentionally misrepresenting Vertrue's authority to charge the consumers' bank and credit card accounts to the banks that issued the consumers' credit or debit cards.

72.

Defendants repeatedly used interstate wire and mail communications for the purpose of executing and furthering such scheme to defraud Plaintiffs and other Class Members, including, *inter alia*:

a. Electronic, mail, and/or telephone communications between Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners discussing the details of their partnership agreement to allow Vertrue to market its Membership Programs in exchange for a portion of the revenue generated therefrom;

b. Thousands of electronic, mail, and/or telephone communications between Vertrue, Adaptive, and MyLife asking for and receiving Plaintiffs' and Class Members' credit or debit card information;

c.  Thousands of electronic and mail communications between Vertrue, Adaptive, and Plaintiffs and Class Members regarding Vertrue's Membership Program offers;

d.  Thousands of transmissions of monthly unauthorized charges to Plaintiffs' and Class Members' credit or debit card accounts for Membership Programs;

e.  Thousands of electronic, mail, and/or telephone communications between Vertrue, Adaptive, and Plaintiffs and Class Members consisting of numerous complaints regarding unauthorized enrollment into, and charges for, Vertrue's Membership Programs;

f.  Thousands of electronic, mail, and/or telephone communications between MyLife and Plaintiffs and Class Members consisting of numerous complaints regarding unauthorized transfer of confidential billing information to Vertrue;

g.  Thousands of electronic, mail, and/or telephone communications between credit card networks, including Defendant MasterCard, and Plaintiffs and Class Members consisting of numerous complaints regarding unauthorized charges on Plaintiffs' and Class Members' accounts for the Membership Programs processed by the credit card companies, including the Defendant Credit Card Companies;

h.  Thousands of electronic or mail transmissions of credit or debit card statements to Plaintiffs and Class Members containing the fraudulent charges, including, *inter alia*, charges for Vertrue's "SavingsAce" service to Plaintiffs' MasterCard for Vertrue's "SavingsAce" service from April 2011 to August 2013;

i.  Thousands of electronic, mail, and/or telephone communications between Vertrue, Adaptive, MasterCard, and other credit card networks and companies regarding processing of monthly unauthorized charges on Plaintiffs' and Class Members' credit or debit cards;

j.  Thousands of electronic, mail, and/or telephone communications between Vertrue and Adaptive Marketing regarding the operation of Vertrue's savings clubs, including the scheme to impose unauthorized charges on Plaintiffs' and Class Members' credit or debit cards;

k.  Thousands of electronic, mail, and/or telephone communications between Vertrue and Plaintiffs and Class Members regarding cancellation of their inadvertent enrollment into the Membership Programs; and

l.  Thousands of electronic, mail, and/or telephone communications among Vertrue personnel regarding how to respond to consumer complaints and/or requests for cancellation of the Membership Programs to minimize the amount of refund.

73.

Each of the predicate acts described above occurred, and continue to occur, every time a Class Member was (and is) scammed by the RICO Enterprise.

74.

Additionally, such scheme to defraud enabled Defendants to unlawfully obtain an enormous amount of funds under the custody or control of the banks that authorized the recurring credit or debit card charges.  Each time Vertrue or MyLife assessed a charge to millions of unwitting consumers pursuant to their fraudulent marketing schemes that resulted in their attainment of the consumers' credit card information without proper consent, Defendants committed bank fraud within the meaning of 18 U.S.C. § 1344.

**Ongoing Pattern of Racketeering Activity**

75.

Defendants have knowingly, intentionally, and/or recklessly engaged in an ongoing, open-ended pattern of racketeering activity by committing millions of predicate acts of wire, mail, and bank fraud, by knowingly and intentionally assessing, without authorization, monthly charges to Plaintiffs' and other Class Members' credit cards as part of their fraudulent marketing scheme described herein.

76.

The racketeering activity was and is related by virtue of common participants, common victims (Plaintiffs and members of the Class), a common structure and method of commission, a common purpose, and a common result of enrolling and charging consumers for unknown and unwanted Membership Programs, thereby defrauding Plaintiffs and Class Members of significant monies and unjustly enriching Defendants and their collaborators.

**Injury to Plaintiffs and Class Members in Their Business or Property by Reason of the Pattern of Racketeering Activity**

77.

As a direct and proximate result of Defendants' ongoing pattern of racketeering activity, Plaintiffs and Class Members have suffered, and continue to suffer, repeated, ongoing injury by virtue of Defendants' unauthorized assessment of monthly fees on Plaintiffs' and Class Members' credit cards.

78.

But for Defendants' scheme to defraud Plaintiffs and Class Members by enrolling them into Vertrue's Membership Programs without their knowledge and assessing monthly charges to their credit cards without first obtaining proper authorization from Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

79.

Plaintiffs and Class Members were unaware of, much less made use of, the services purportedly provided by these Membership Programs.

80.

Plaintiffs and Class Members are direct victims of Defendants' wrongful and unlawful conduct. Without authorization, Defendants withdrew monies from Plaintiffs' and Class Members' banks and credit card accounts on an ongoing basis.

81.

As the direct victims of Defendants' wrongful and unlawful conduct, Plaintiffs and Class Members have been injured in an amount according to proof. Damages will be calculated with greater accuracy according to information in Defendants' records. Because the information necessary to calculate damages is contained in Defendants' records, the Court will not need to adopt complicated rules apportioning damages in order to obviate multiple recoveries. Plaintiffs will seek leave of Court to amend this Complaint to set forth the exact amount thereof when the same is ascertained.

82.

The pattern of racketeering activity, as described herein, is continuous, ongoing, and will continue unless Defendants are enjoined from continuing these

racketeering practices.   Vertrue, MasterCard, and the other Defendants have consistently demonstrated unwillingness to discontinue the illegal or improper practices described herein, and continue this pattern of racketeering as of this moment.

83.

As a direct and proximate result of the racketeering activities of Defendants as described herein, Plaintiffs and Class Members are entitled to recover treble damages for the injuries they have sustained, according to proof, restitution, as well as costs of suit and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

84.

As a direct and proximate result of the racketeering activities of Defendants as described herein, Plaintiffs and Class Members are entitled to an Order, pursuant to 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in the unlawful conduct in which the RICO Enterprise has engaged.

85.

By virtue of their violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs and Class Members for three times the damages that Plaintiffs and Class Members suffered as a result of Defendants' scheme to defraud consumers.

40

## COUNT II

(Violations of Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §
1962(d) – Against All Defendants)

86.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as
though fully set forth herein.

87.

In violation of 18 U.S.C. § 1962(d), Defendants agreed with each other to
enter into a conspiracy to, and did, in fact, conduct and participate in the affairs of
the RICO Enterprise, directly or indirectly, through a pattern of racketeering
activity, which included the repeated acts of mail fraud, wire fraud, and bank fraud
as alleged above.

88.

In furtherance of this conspiracy, Defendants committed numerous overt
acts as alleged above in the pattern of racketeering described above, including, but
not limited to, entering into partnership agreements which provided the structure,
mechanism, and strong financial incentive to carry out the scheme to defraud
Plaintiffs and Class Members of monthly fees by surreptitiously enrolling them in
the Membership Programs.

89.

As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs and Class Members have been injured in their business and property within the meaning 18 U.S.C. § 1964(c), and are entitled to recover treble damages, together with the costs of this lawsuit, expenses and reasonable attorneys' fees.

## **COUNT III**
(Aiding and Abetting Violations of RICO, §§ 1961-1968 – Against Defendants MasterCard, Velo, and Oak Investment)

90.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

91.

MasterCard, Velo, and Oak Investment aided and abetted Vertrue, Adaptive, and MyLife in violating, and conspiring to violate the RICO statutes, namely 18 U.S.C. §§ 1961-1968.

92.

Without MasterCard's continued cooperation by continually processing the recurring Vertrue credit card charges, Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners could not accomplish the fraudulent marketing scheme to enroll consumers in the Membership Programs without their knowledge or consent.

Moreover, without the investments and active oversight from Oak Investment, MyLife could not have accomplished its part in the fraudulent marketing scheme.

93.

MasterCard, Velo, and Oak Investment aided and abetted Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners in their repeated commission of mail, wire, and bank frauds, with full knowledge that the consumers never provided their confidential billing information directly to Vertrue, and never provided informed consent to Vertrue to charge a monthly fee on their credit cards.

## **COUNT IV**
(Aiding and Abetting Commissions of Mail Fraud, 18 U.S.C. § 1341, Wire Fraud, 18 U.S.C. § 1343, and Bank Fraud, 18 U.S.C. § 1344 – Against Defendant MasterCard)

94.

Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

95.

MasterCard aided and abetted Vertrue, Adaptive, and MyLife in violating, and conspiring to violate, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1344 (bank fraud).

96.

Without MasterCard's continued cooperation in processing the recurring Vertrue credit card charges, Vertrue, Adaptive, MyLife, and Vertrue's other

Marketing Partners could not accomplish the fraudulent marketing scheme to enroll consumers in the Membership Programs without their knowledge or consent.

97.

MasterCard aided and abetted Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners in their repeated commission of mail, wire, and bank frauds with full knowledge that the consumers never provided their confidential billing information directly to Vertrue, and never provided informed consent to Vertrue to charge a monthly fee on their credit cards.

## COUNT V
(Violations of Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, *et seq*. – Against Vertrue, Adaptive, MyLife, Velo, and Oak Investment)

98.

Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

99.

The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication."  18 U.S.C. § 2511(1)(a).

100.

"Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce."  18 U.S.C. § 2510(12).

101.

"Intercept" means the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

102.

The transmission over the Internet of the confidential credit or debit card account information to various e-merchants, including MyLife, by Plaintiffs and Class Members constitutes "electronic communications" within the meaning of 18 U.S.C. § 2510(12).  The transmission is a private communication among these e-merchants and Plaintiffs and Class Members, made for the sole purpose of purchasing the e-merchants' products and/or services not including Vertrue's Membership Programs.

103.

Without prior notice to Plaintiffs and Class Members, and in furtherance of its fraudulent marketing scheme to enroll and charge unwitting consumers for the

Membership Programs as alleged in this Complaint, Vertrue entered into partnership agreements with MyLife and its other Marketing Partners to intentionally intercept, and did intercept, Plaintiffs' and Class Members' confidential credit card information by means of electronic devices, including, but not limited to, their computers, in violation of 18 U.S.C. § 2510(l)(a). Velo was an active participant in the improper conduct and further, as Vertrue's owner, is liable for Vertrue's actions through the principle of respondeat superior. Velo's corporate and limited liability protections do not shield it from responsibility for Vertrue's actions since Velo was fully aware of and profited from Vertrue's multiple acts of wire fraud. Oak Investment, similarly, was an active participant in MyLife's improper conduct and is also vicariously liable through the theory of respondeat superior for MyLife's unauthorized relaying of consumer credit card data to Vertrue without the consumers' knowledge and consent. As a major MyLife investor, Oak Investment was fully aware of and profited from MyLife's multiple acts of wire fraud. Consequently, Oak Investment's limited partnership status does not shield it from vicarious liability for MyLife's actions.

104.

Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Class Members are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual and

46

punitive damages, reasonable attorneys' fees and other litigation costs, and Defendants' profits obtained from the above-described violations.

## COUNT VI

(Aiding and Abetting Violations of Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*. – Against MasterCard)

105.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

106.

MasterCard aided and abetted Vertrue and Adaptive in violating, and conspiring to violate, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*.

107.

Without MasterCard's continued cooperation in the processing of recurring Vertrue credit card charges, Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners could not accomplish the fraudulent marketing scheme to enroll consumers in Membership Programs without their knowledge or consent.

108.

MasterCard aided and abetted Vertrue, MyLife, and Vertrue's other Marketing Partners in their intentional interception of Plaintiffs' and Class Members' confidential credit card information by means of electronic devices, including, but not limited to, their computers, with full knowledge that the consumers never provided their confidential billing information directly to Vertrue, and never provided informed consent to Vertrue to charge a monthly fee on their credit cards.

## **COUNT VII**

(Violation of Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, *et seq.* – Against Vertrue, Adaptive, Velo, MyLife, Oak Investment, and MasterCard)

109.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

110.

Defendants' marketing and sale of the Membership Programs as described herein is an unfair and deceptive act and practice in violation of Tenn. Code Ann. § 47-18-101(b).

111.

Tennessee's Consumer Protection Act prohibits "[f]alsely passing off goods or services as those of another," as well as "[c]ausing likelihood of confusion or of

misunderstanding as to the source . . . of goods or services." Tenn. Code Ann. § 47-18-101(b)(1)-(2).

112.

Vertrue and MyLife violated these provisions by displaying ads for Vertrue's savings club memberships as part of MyLife's checkout process in a way designed to conceal the Vertrue ads' actual purpose. The wording of the ads is vague and muddled by design, and Defendants intend for users to sign up for services without realizing that they have done so. Consequently, numerous consumers, including the Chis, have inadvertently signed up for Vertrue's services by accident while believing that they were doing business with MyLife. The other Defendants, through their active participation in the improper conduct of Vertrue and MyLife, are also liable. Further, Velo, as Vertrue's owner, is liable for Vertrue's actions through respondeat superior liability. Velo's corporate and limited liability protections do not shield it from responsibility for Vertrue's actions since Velo was fully aware of and profited from Vertrue's intentional deceitful acts. Oak Investment, similarly, is vicariously liable through the theory of respondeat superior for MyLife's intentional deceitful acts. As a major MyLife investor, Oak Investment was fully aware of and profited from MyLife's deception. Consequently, Oak Investment's limited partnership status does not shield it from vicarious liability for MyLife's actions.

113.

As a result of Defendants' fraudulent and unfair business practices, Plaintiffs and other Class Members have suffered ascertainable losses of money or property within the meaning of Tenn. Code Ann. § 47-18-109(a)(1) and have been damaged by Defendants' unlawful acts.  If this claim is ultimately not permitted to proceed on behalf of the Class, then this Count should be deemed to be brought solely on an individual basis by Plaintiffs.

114.

Since Defendants' unfair and deceptive acts were willful and knowing, Plaintiffs and Class Members are entitled to recover treble damages for the injuries they have sustained.  Tenn. Code Ann. § 47-18-109(a)(3).  Plaintiffs should also receive costs of suit and reasonable attorneys' fees.  Tenn. Code Ann. § 47-18-109(e)(1).

### **<u>COUNT VIII</u>**
(Aiding and Abetting Violation of Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, *et seq.* – Against MasterCard)

115.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

116.

MasterCard aided and abetted Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners in violating, and conspiring to violate, Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, *et seq.*

117.

Without MasterCard's continued cooperation in processing the recurring Vertrue credit card charges, Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners could not accomplish the fraudulent marketing scheme to enroll consumers in the Membership Programs without their knowledge or consent.

118.

MasterCard aided and abetted Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners to commit unfair and deceptive acts, as described herein, with full knowledge that the consumers never provided their confidential billing information directly to Vertrue, and never provided informed consent to Vertrue to charge a monthly fee on their credit cards.

## **COUNT IX**
(Fraudulent Misrepresentation – Against Vertrue, Adaptive, Velo, MyLife, and Oak Investment)

119.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

120.

"In order to establish a claim for fraudulent . . . misrepresentation" in Tennessee, "a plaintiff must" demonstrate that

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City, 387 S.W.3d 525, 548 (Tenn. Ct. App. 2012).

121.

Through the intentionally confusing wording and layout of their Membership Club "signup" screens, Vertrue and Adaptive fraudulently represented to Plaintiffs and Class Members that such screens represented either an innocuous part of the Marketing Partner payment process, or offers for "risk free" "cash back" programs that did not entail a significant financial commitment. These representations were false when made, since clicking on the "signup" buttons neither caused an innocuous progression to the next step of the Marketing Partner payment process, nor initiated a "risk free" membership. Rather, these

misrepresentations concealed the material fact that consumers were "joining" alleged Membership Clubs that entailed recurring monthly fees frequently in excess of twenty dollars. Vertrue and Adaptive made these misrepresentations knowingly since Vertrue's entire business model is based on misleading consumers into accidentally "joining" its Membership Clubs. Further, Plaintiffs and Class Members reasonably relied on the innocuous-seeming appearance of Vertrue and Adaptive's signup pages and reasonably believed that they had not made a significant, recurring financial commitment to Vertrue. As a consequence of their reasonable reliance on Vertrue and Adaptive's misrepresentations, Plaintiffs and Class Members lost considerable amounts of time and money.

122.

Velo, as Vertrue's owner, is liable for Vertrue and Adaptive's fraudulent misrepresentations through the principle of respondeat superior. Velo's corporate and limited liability protections do not shield it from responsibility for Vertrue and Adaptive's actions since Velo was fully aware of and assisted and profited from Vertrue's scheme.

123.

By displaying Vertrue's intentionally confusing and misleading Membership Club "signup" screens, MyLife fraudulently represented to Plaintiffs and Class Members that such screens represented either an innocuous part of MyLife's

payment process, or offers for "risk free" "cash back" programs that did not entail a significant financial commitment. These representations were false when made, since clicking on the "signup" buttons neither caused an innocuous progression to the next step of MyLife's payment process, nor initiated a "risk free" membership. Rather, these misrepresentations concealed the material fact consumers were "joining" alleged Membership Clubs that entailed recurring monthly fees frequently in excess of twenty dollars. MyLife made these misrepresentations knowingly since it was well aware that Vertrue's entire business model is based around misleading consumers into accidentally "joining" its Membership Clubs. Further, Plaintiffs and Class Members reasonably relied on the innocuous-seeming appearance of these signup pages and reasonably believed that they had not made a significant, recurring financial commitment to Vertrue. As a consequence of their reasonable reliance on MyLife's misrepresentations, Plaintiffs and Class Members lost considerable amounts of time and money.

124.

Oak Investment, as MyLife's owner, is liable for MyLife's fraudulent misrepresentations through the principle of respondeat superior. Oak Investment's corporate and limited liability protections do not shield it from responsibility for MyLife's actions since Oak Investment was fully aware of and assisted and profited from MyLife's participation in Vertrue's scheme.

## COUNT X

(Aiding and Abetting Violation Fraudulent Misrepresentation – Against MasterCard)

125.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

126.

MasterCard aided and abetted Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners in fraudulently misrepresenting the nature of Vertrue's membership club ads.

127.

Without MasterCard's continued cooperation in processing the recurring Vertrue credit card charges, Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners could not accomplish their scheme to fraudulently misrepresent the nature of Vertrue's Membership Club "signup" screens in order to misappropriate funds from Plaintiffs and Class Members.

128.

MasterCard aided and abetted Vertrue, Adaptive, MyLife, and Vertrue's other Marketing Partners in committing these fraudulent misrepresentations, as described herein, with full knowledge that Plaintiffs and Class Members were

unknowingly making "membership" payments due to their reliance on false and misleading information.

## **COUNT XI**

(Negligent Misrepresentation – Against Vertrue, Adaptive, Velo, MyLife, and Oak Investment)

129.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

130.

In order to state a claim for negligent misrepresentation under Tennessee law, a plaintiff must show that

> (1) the defendant [was] acting in the course of his business, profession, or employment, or in a transaction in which he ha[d] a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplie[d] faulty information meant to guide others in their business transactions; and (3) the defendant fail[ed] to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relie[d] upon the information.

PNC Multifamily, 387 S.W.3d at 549.

131.

Vertrue and Adaptive, in the course of marketing their Membership Programs, negligently represented to Plaintiffs and Class Members that their alleged Membership Club "signup" screens represented either an innocuous part of the Marketing Partner payment process, or offers for "risk free" "cash back" programs that did not entail a significant financial commitment.  Vertrue and Adaptive presented this faulty information to Plaintiffs and Class Members in an attempt to guide Plaintiffs and Class Members into joining Vertrue's Membership Clubs.  Vertrue and Adaptive failed to exercise reasonable care in communicating the terms of their "offers" on these Membership Club "signup" screens since clicking on the "sign up" buttons neither caused an innocuous progression to the next step of the Marketing Partner payment process, nor initiated a "risk free" membership.  Plaintiffs and Class Members justifiably relied on the innocuous-seeming appearance of Vertrue and Adaptive's signup pages and reasonably believed that they had not made a significant, recurring financial commitment to Vertrue.  As a consequence of their reasonable reliance on Vertrue and Adaptive's negligent misrepresentations, Plaintiffs and Class Members lost considerable amounts of time and money.

132.

Velo, as Vertrue's owner, is liable for Vertrue and Adaptive's negligent misrepresentations through the principle of respondeat superior. Velo's corporate and limited liability protections do not shield it from responsibility for Vertrue and Adaptive's negligent misrepresentations since Velo was fully aware of and profited from Vertrue's negligence.

133.

In the course of registering members for its social networking service, MyLife negligently displayed misleading "signup" screens for Vertrue's savings clubs that appeared either to represent an innocuous part of the MyLife signup process, or offers for "risk free" "cash back" programs that did not entail a significant financial commitment. MyLife presented this faulty information to Plaintiffs and Class Members in an attempt to guide Plaintiffs and Class Members into joining Vertrue's savings clubs. MyLife failed to exercise reasonable care in communicating the terms of Vertrue's "offers" on these "signup" screens since clicking on the "signup" buttons neither caused an innocuous progression to the next step of the MyLife's registration process, nor initiated a "risk free" membership. Plaintiffs and Class Members justifiably relied on the innocuous-seeming appearance of these signup pages and reasonably believed that they had not made a significant, recurring financial commitment to Vertrue. As a

consequence of their reasonable reliance on MyLife's negligent misrepresentations, Plaintiffs and Class Members lost considerable amounts of time and money.

134.

Oak Investment, as MyLife's owner, is liable for MyLife's negligent misrepresentations through the principle of respondeat superior. Oak Investment's corporate and limited liability protections do not shield it from responsibility for MyLife's negligent misrepresentations since Oak Investment was fully aware of and profited from MyLife's negligence.

**COUNT XII**
(Breach of Contract – Against MasterCard)

135.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

136.

MasterCard's contracts with customers and card issuing banks provide that MasterCard will not knowingly process improper or fraudulent transactions. MasterCard has violated these contractual provisions.

137.

A duty of good faith and fair dealing is implied in every contract. Consequently, MasterCard, when processing charges on Plaintiffs and Class

59

Members' credit card accounts, had a duty to process such charges in good faith and reject any transactions that it knew to be illegitimate.

138.

MasterCard breached this duty by repeatedly and knowingly approving, processing, and profiting from Vertrue's and MyLife's fraudulent charges on Plaintiffs' and Class Members' credit card accounts.

139.

MasterCard undisputedly had full knowledge of the fraudulent nature of these charges and could have easily put systems in place to prohibit them. For years, MasterCard has received numerous customer complaints expressing outrage over Vertrue's unauthorized "fees," as well as letters of concern from a United States Senator and a Harvard Business School professor. Nevertheless, years after Senator Rockefeller and Professor Edelman urged MasterCard to stop Vertrue and similar companies from exploiting consumers through its credit card network, MasterCard continues to allow, and profit from, Vertrue's exploitation of its customers. MasterCard continues to knowingly process these illegitimate charges since it earns fees from every such charge, and additionally earns processing fees whenever a customer convinces Vertrue to return some of its ill-gotten funds.

140.

MasterCard's practices, in short, constitute an egregious breach of its agreements and Plaintiffs and Class Members should receive relief under those agreements for MasterCard's wrongdoing.

## <u>COUNT XIII</u>
(Unjust Enrichment – Against All Defendants)

141.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

142.

As a result of Defendants' fraudulent, deceptive, and unlawful conduct, Plaintiffs and Class Members have conferred benefits upon Vertrue, Adaptive, and Velo in the form of recurring, monthly payments for Vertrue's Membership Programs.  MyLife and Oak Investment have received compensation in the form of "bounties" derived from these payments, and MasterCard has received service fees as a result of these payments.

143.

Defendants were at all times aware that the benefits conferred upon them by Plaintiffs and Class Members were the result of Defendants' fraudulent, deceptive, and wrongful conduct.

144.

Allowing Defendants to retain these unjust profits and other benefits would offend traditional notions of justice and fair play.  Under these circumstances, it would be inequitable for Defendants to retain the benefits, and allowing them to do so would induce companies to fraudulently conceal, mislead, and/or misrepresent key characteristics and obligations of their products in order to increase sales and profit.

145.

Plaintiffs, on behalf of themselves, and all others similarly situated, seek restitution from Defendants and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      For an order certifying this action as a class action on behalf of the Class described above, appointing Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

B.      For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs and members of the Class;

C.      For damages according to proof;

D.      For an award of treble damages where permitted under applicable law;

E.      For an award of punitive damages where permitted under applicable law;

F.      For preliminary and permanent injunctive relief, including an injunction prohibiting Defendants from any further engagement in the fraudulent marketing scheme to enroll consumers into the Membership Programs and charge a monthly fee without authorization;

G.      For an award of attorneys' fees as appropriate pursuant to the above cited statutes;

H.      For costs of suit herein incurred;

I.      For both pre- and post-judgment interest on any amounts awarded; and

J.      For such other and further relief as the Court may deem proper.

DATED this 28th day of February, 2014.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

 */s/ E. Adam Webb*
E. Adam Webb
  Georgia State Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia State Bar No. 141315
Stephen Sills
  Georgia State Bar No. 737358

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Franklin@WebbLLC.com
Stephen@WebbLLC.com

Attorneys for Plaintiffs